**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KAREN HYLTON, | |
| Plaintiff, | Civil Action No. 21-cv-2673 (JMC) |
| v. | |
| DISTRICT OF COLUMBIA, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

Plaintiff Karen Hylton brings this suit against the District of Columbia Metropolitan Police Department (MPD) and its Officer Christopher Delisi, alleging that Delisi violated her Fourth and Fifth Amendment rights by unlawfully seizing her and using excessive force as Hylton spray-painted (with permission, she claims) the side of a building at night. Hylton also claims that she was subject to battery, false arrest, and a retaliatory arrest during that encounter. But body-worn camera (BWC) footage—footage whose validity she does not contest—refutes those claims in their entirety. That footage reveals nothing more than a brief and reasonable investigatory stop for apparent vandalism, followed by a brief and reasonable seizure for assault of a police officer. Within two minutes of Delisi's initial approach, Hylton left the scene with no further arrest, no charges, and no serious injuries. Because no reasonable jury could find that encounter to violate the alleged provisions of the U.S. Constitution or D.C. law, the Court will **GRANT** Defendants' motion for summary judgment on all of Hylton's claims.[1]

---

[1] Unless otherwise indicated, the formatting of quoted materials has been modified throughout this opinion, for example, by omitting internal quotation marks and citations, and by incorporating emphases, changes to capitalization, and other bracketed alterations therein. All pincites to documents filed on the docket are to the automatically generated ECF Page ID number that appears at the top of each page.

## I.    BACKGROUND

### A.  Factual Background

For the reasons explained below, the Court treats Defendants' motion as a motion for summary judgment. On this motion, the record before the Court is limited to BWC footage from three officers, including Delisi, which Defendants submitted with their motion. *See* ECF 26-2 at 1. This opinion refers to Delisi's BWC footage as "Delisi BWC" and uses the "Stabilized" version provided. *See id.* (citing Delisi BWC (X6039BF0Q) (Stabilized)). The opinion refers to the other two officers' BWC footage as "Officer 2 BWC," *see id.* (citing BWC (X6039BF2F)) and "Officer 3 BWC," *see id.* (citing BWC (X039BEZ1)). The Court accepts the Parties' characterizations of what the footage shows where the Parties agree. Where they disagree as to what the footage shows, the Court resolves those disagreements in favor of Hylton unless her characterization "is blatantly contradicted by" the video footage. *Scott v. Harris*, 550 U.S. 372, 380 (2007). If the video does contradict her account, and thereby renders her characterization a "visible fiction," the Court views the facts "in the light depicted by" the BWC footage. *Id.* at 380–81.

The following facts are undisputed. At around 6:16 PM on the night of November 14, 2020, Karen Hylton was with a friend in a parking lot in Northwest Washington, D.C.[2] ECF 26-1 ¶ 1. Delisi observed Hylton spray-painting the side of a privately-owned row home that abutted the parking lot, which also had some "pre-existing graffiti" on it. *Id.*; ECF 28-1 ¶ 102. Delisi did not believe Hylton to be the owner of that home, and he walked up to her. ECF 26-1 ¶¶ 2–4. As he walked closer, Hylton stopped spray-painting the wall, turned around, and approached him. *Id.*

---

[2] Although both Parties reference November 19, 2020, instead of November 14, 2020, at various points, the Court uses the November 14 date stated in Defendants' Statement of Material Facts and visible in the BWC footage. *See* ECF 26-1 ¶ 1. Regardless, resolution of this factual detail does not affect the outcome of this case.

¶ 4. At first, she accused him of having turned off his body-worn camera, but he responded, "No, we [he and the other officer(s) present] turned them on. We're trying to talk to you." *Id.* ¶ 6.[3]

Hylton responded, "Okay. Like I—You're not trying to talk to me. You're tryna tell me what I cannot do. Y'all cannot kill my son. You can't kill my fucking son and think you'll get away with it." *Id.* ¶ 7.[4] Those remarks referred to the death of her son, Karon Hylton-Brown, who died in a police chase a few weeks prior. One of the MPD officers involved was ultimately convicted of second-degree murder for Karon's death—though he later received a presidential pardon.[5] To Hylton's remarks, Delisi responded, "I'm telling you, you can't spray paint there." *Id.* ¶ 8. Hylton began to respond, "And I'm telling you, you can't—" but then stopped talking, approached the wall, and resumed spray-painting it. *Id.* ¶ 9.

At that point, Delisi moved closer to Plaintiff and said, "Okay. We're not doing that. You're not doing that. You're not doing that," as she spray-painted the wall. *Id.* ¶ 10.[6] He then attempted to take the spray-paint can away from her by grabbing for her right arm, which was holding the can. *Id.* ¶ 11. He also placed his left hand on Hylton's back, with some degree of force, as he held her right arm.[7] *Id.* ¶ 12.

---

[3] The fact that Delisi's BWC footage of this encounter exists (and is before this Court) confirms that his BWC was not turned off during this encounter.

[4] In her counterstatement of facts, Hylton says the exact words "may be slightly different" because some are "hard to make out" in the BWC footage, but she does not "generally dispute[]" this characterization. ECF 28-1 ¶ 7. Note also that the audio on Delisi's BWC was off during the first moments of their encounter. Accordingly, the Court does not know (nor do the Parties claim to know) exactly what Delisi said to Hylton before she accused him of having turned off his body-worn camera. But her next statement—"You're tryna tell me what I cannot do"—suggests that he told her to stop spray-painting the building as soon as he walked up and before she responded as such. ECF 28-1 ¶ 7. That sequence of events is consistent with both Parties' account.

[5] *See* Verdict Form, *United States v. Sutton*, No. 21-cr-598 (D.D.C. Dec. 21, 2022), ECF 426; White House, Executive Grant of Clemency for Terence Sutton (Jan. 22, 2025), https://perma.cc/92ZT-47SC. The Court "may take judicial notice of public records . . . in adjudicating a motion for summary judgment." *Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 235 (D.D.C. 2016) (citing *Covad Commc'ns Co. v. Bell Atl. Corp.*, 407 F.3d 1220, 1222 (D.C. Cir. 2005)).

[6] Again here, Hylton says the exact words may have differed slightly from this quote, because it is hard to make out what is being said from the video, but she does not generally dispute the characterization. ECF 28-1 ¶ 10.

[7] Hylton disputes Defendants' characterization that Delisi merely "place[d] his hands" on her and argues that the video shows that he "did more than" that. ECF 28-1 ¶ 12. The Delisi BWC footage shows that Delisi used some degree of

The Parties dispute what happened next. According to Defendants, Hylton "turned around and swung her arms at Officer Delisi, hitting him." *Id.* ¶ 13. Hylton disputes that characterization and points to the BWC footage for support. ECF 28-1 ¶ 13. That footage makes clear that Hylton did indeed turn around and swing her left arm, which by that point was holding the can of spray-paint, at Delisi's upper body or face (at a level above his BWC). *See* Delisi BWC 18:17:01–03.[8]

The Parties dispute the next set of events, too. Defendants say that Delisi then attempted to arrest Hylton for assault on a police officer ("APO"), a crime in the District of Columbia. *See* D.C. Code § 22–405(b) (criminalizing those who, "without justifiable and excusable cause assault[] a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties"). For support, Defendants point to both the contemporaneous BWC footage and the recording from several minutes later, when Delisi was recounting the incident to another officer and stated that he had been "trying to handcuff [Hylton]." ECF 26-1 ¶ 14 (citing Delisi BWC 18:22:10, 18:28:31). Hylton, however, contends that "[t]here is no contemporaneous evidence that Officer Delisi attempted to arrest [her]." ECF 28-1 ¶ 14. She suggests that the footage of the interaction itself does not establish that Delisi was trying to arrest her, and that Delisi's post hoc explanation is not "contemporaneous evidence" and therefore not determinative. *Id.*; ECF 28 at 11.

---

force when placing his hand on her back, but not enough to push her forward toward the wall, and he then removed his hand as Hylton turned around. Delisi BWC 18:17:00–18:17:02. Construing this ambiguity in favor of Hylton, the Court will accept that Delisi used some degree of force on Hylton's back in that moment but finds that Defendants' characterization is essentially accurate based upon the video footage. And ultimately, whether Delisi merely "placed his hand" on Hylton or did something "more" is not material to the outcome of this case.

[8] Although the video establishes that Hylton swung her arm at Delisi, it does not clearly show whether Hylton actually "hit[]" Delisi, as Defendants claim. ECF 26-1 ¶ 13. Thus, the Court does not find, for purposes of this motion, that Hylton hit Delisi. But whether she made contact with Delisi or merely swung at him and missed does not change the result in this case.

Ultimately, what Delisi was "trying" to do in that moment is immaterial, as the Court will explain below. What is both material and clear from the BWC footage, however, is that Hylton and Delisi engaged in a physical struggle after she turned around and swung her arm at him. *See* Delisi BWC 18:17:05–18:17:12. That struggle included Delisi turning Hylton back around to face the wall that she had been spray-painting and working with another officer to hold her against the wall. *See id.* At that point, a crowd had formed around Hylton, Delisi, and the other officer(s) at the scene, and two other MPD officers approached. ECF 26-1 ¶ 15; *see* Officer 2 BWC 18:17:05–18:17:15; Officer 3 BWC 18:17:13–18:17:36. Defendants characterize Hylton's behavior during that struggle as "resist[ing]" arrest, whereas Hylton again disputes that Delisi was trying to arrest her. ECF 26-1 ¶ 16; ECF 28-1 ¶ 16. Regardless of what Delisi was trying to do during that period, the videos clearly show a physical struggle between the officers and Hylton. Delisi BWC 18:17:05–18:17:35; Officer 2 BWC 18:17:14–18:17:37; Officer 3 BWC 18:17:19–18:17:41. During that time, men in the observing crowd interfered and tried to pull Hylton away from the officers. ECF 26-1 ¶ 17. *Id.* Within about 35 seconds of Hylton first swinging her arm at Delisi, the men in the crowd had successfully pulled Hylton away from the officers, and she left the scene. ECF 26-1 ¶ 17. [9]

About five minutes later, as Delisi recounted the incident to a group of officers on the scene and then to someone (apparently a supervisor) over the phone, Delisi repeatedly stated that he "tried to grab [Hylton] real quick" to "get her to stop spray-painting the wall." ECF 28-1 ¶ 101

---

[9] The BWC footage does not clearly show exactly what happened in the period between Hylton's swing at Delisi and the men in the crowd pulling her away. Delisi's BWC is obscured during much of the encounter, and the other two officers' footage does not capture large portions of it. The court does not attempt to reconstruct exactly what happened. Its findings here are based only on what is clear from the video, which is that a scuffle ensued that included Delisi and at least one other officer physically restraining Hylton for a maximum of about 35 seconds until she left the scene. *See* Delisi BWC 18:17:00–18:17:38; Officer 2 BWC 18:17:00–18:17:38; Officer 3 BWC 18:17:00–18:17:38.

(quoting Delisi BWC 18:22:40–18:22:54). He also said that he had "never known [Hylton] to live" at the house she was painting and that he "d[id]n't recognize her as being the owner," despite her claim during the encounter that it was her house. ECF 26-1 ¶ 3 (quoting Delisi BWC 18:25:38– 18:25:45, 18:22:44); ECF 28-1 ¶ 3.[10]

### B. Procedural Background

Hylton initially filed a pro se complaint in this court. ECF 1. Her factual assertions recounted the events of November 14, 2020, as well as another incident that allegedly occurred in December 2020. *See generally id*. The allegations related to the December event were not included in subsequently filed amended complaints and are no longer relevant to the disposition of this case. Complying with this Court's instructions, Hylton filed an amended complaint. *See* ECF 3; ECF 4. Defendants filed a motion to dismiss the amended complaint. ECF 14. Hylton then obtained counsel and filed a second amended complaint, ECF 21, which is the operative complaint in this case. The second amended complaint names the District of Columbia and Delisi as Defendants and brings claims alleging unreasonable seizure, excessive force, false arrest, retaliation, and battery. ECF 21 ¶¶ 3–4, 47–70. Defendants filed another motion to dismiss or for summary judgment, ECF 26, to which Hylton responded, ECF 28, and Defendants replied, ECF 29.

## II.    LEGAL STANDARD

For the reasons discussed below, the Court construes Defendants' motion as a motion for summary judgment. The Court may grant summary judgment only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court "must draw all reasonable

---

[10] Defendants rely in their statement of facts on the truth of this statement. *See* ECF 26-1 ¶ 3. Hylton does not dispute this statement or make a hearsay objection, so the Court considers it.

inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). As long as the non-moving party "present[s] evidence from which a jury might return a verdict in his favor," then "there is a genuine issue of fact that requires a trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). However, a genuine dispute of fact does not exist where one party's account of the facts is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott*, 550 U.S. at 380. Where video footage reveals such blatant contradictions, courts must view those disputed facts "in the light depicted by the videotape." *Id.* at 380–81.

## III.    ANALYSIS

### A.  Construing Defendants' Motion

Defendants style their instant motion as a motion to dismiss Hylton's second amended complaint or, in the alternative, as a motion for summary judgment. *See* ECF 26 at 1, 24. On reply, they repeat their request that this Court either "dismiss [Hylton's] claims or enter judgment in favor of [Defendants]." ECF 29 at 5. As the basis for a summary judgment posture, Defendants point to the BWC footage that they attached to their motion. *See* ECF 26-2. Hylton, meanwhile, prefers that this Court construe Defendants' motion as a motion to dismiss, not one for summary judgment. ECF 28 at 9–10. According to Hylton, the video footage does not "material[ly] contradict[]" Hylton's allegations and therefore need not be considered. *Id.* at 10 (stating that a court need only "view the facts in the light depicted by the videotape" when "a plaintiff's recitation of facts contradicts accurate video footage of an incident" (quoting ECF 26 at 6; *Scott*, 550 U.S. at 380–81)).

The Court thus proceeds to a summary judgment posture because, despite Hylton's insistence otherwise, the BWC footage directly contradicts Hylton's account of a material fact in this case. That key fact arose after Delisi told Hylton not to continue spray-painting the wall and

then grabbed her arm and back. In both her second amended complaint and her opposition to Defendants' motion, Hylton asserts that she merely turned around and exclaimed, "Yo!" at him, and then Delisi began using additional force against her. *See* ECF 21 ¶¶ 34–35; ECF 28 at 13 n.3; ECF 28-1 ¶ 12. But Delisi's BWC footage clearly shows Hylton swinging her left arm at Delisi's face or upper body after he initially touched her arm and before he tried to restrain her further. *See* Delisi BWC 18:17:01–03; ECF 26-1 ¶ 13.

Both Parties here acknowledge that a summary judgment posture would be appropriate if the body-worn camera footage contradicted Hylton's account of the facts. *See* ECF 28 at 10; ECF 26 at 15. That is consistent with the rule in *Scott* and the practice of courts in this Circuit, which deal with motions of this kind as summary-judgment motions only when the defendant's video evidence contradicts the plaintiff's account of the facts. *Compare Leach v. District of Columbia*, No. 19-cv-947, 2022 WL 1316436, at *3 (D.D.C. May 3, 2022) (treating the motion as one for summary judgment for the claims as to which the body-worn camera footage was relevant), *and Smith v. United States*, 121 F. Supp. 3d 112, 117 n.4 (D.D.C. 2015), *aff'd*, 843 F.3d 509 (D.C. Cir. 2016) (same), *with Singleton v. District of Columbia*, No. 21-cv-1914, 2022 WL 4235128, at *2, 5–6 (D.D.C. Sept. 14, 2022) (treating the motion as a motion to dismiss, and dismissing, despite defendants' submission of BWC footage).

The Court is mindful of the D.C. Circuit's instruction that district courts "ha[ve] discretion whether to consider affidavits or other factual matter outside the pleadings" and must "exercise[] . . . great caution and attention to the parties' procedural rights" when choosing to convert a motion to dismiss into a motion for summary judgment. *Hurd v. District of Columbia*, 864 F.3d 671, 687 (D.C. Cir. 2017). Specifically, Federal Rule of Civil Procedure 12(d) requires courts to give parties "a reasonable opportunity to present all the material that is pertinent to the

motion" when outside-the-pleadings evidence converts a motion to dismiss into a motion for summary judgment. Fed. R. Civ. P. 12(d). And Rule 56 permits a nonmovant to submit an "affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to a summary judgment motion, and allows the Court to then defer or deny the motion, give additional time for discovery, or enter "any other appropriate order." Fed. R. Civ. P. 56(d). But here, Hylton does not invoke those procedural rights in response to Defendants' pre-discovery summary judgment motion.[11] Instead, she merely insists that "Defendants have not identified any material contradictions" between the allegations in her second amended complaint and the BWC footage. ECF 28 at 10. But she is wrong about that: Defendants have, in fact, identified a material contradiction. Accordingly, the Court construes Defendants' motion as a motion for summary judgment and considers all the evidence before it.

### B. Unreasonable Seizure

Hylton claims that Delisi violated her Fourth Amendment right to be free from unreasonable seizure by restraining her movement despite her assertions that she had permission to spray-paint the building. ECF 21 ¶¶ 47–50. Delisi argues that the Court should enter judgment in his favor because he had probable cause to seize Hylton. ECF 26 at 17–20. The Court finds that Delisi possessed (at least) reasonable suspicion that Hylton was illegally spray-painting the wall, which gave him reason to conduct an investigative stop and try to restrain Hylton from continuing to spray-paint the wall. Then, when Hylton turned around and swung at Delisi, he had probable

---

[11] While Hylton refers to the fact that discovery has not yet begun, she does not submit the required affidavit or declaration establishing that she cannot present facts necessary to justify her opposition or the need for additional discovery beyond the BWC footage. Rather, she responds fully to Defendants' statement of purported material and undisputed facts and offers additional facts of her own, citing record evidence (the BWC footage). *See* ECF 28-1.

cause to further seize her for assaulting a police officer. His seizures were therefore reasonable as a matter of law.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, the lawfulness of any given seizure depends on whether it was reasonable. *See id.* In general, a warrantless arrest is reasonable if an officer has "probable cause to believe that the suspect committed a crime in the officer's presence." *District of Columbia v. Wesby*, 583 U.S. 48, 56 (2018). Whether an officer had probable cause is determined by evaluating the fact pattern from "the standpoint of an objectively reasonable police officer." *Id.* at 56–57 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). This is a relatively low bar: officers need only demonstrate "a probability or substantial chance of criminal activity," not an absolute certainty that criminal activity occurred. *Id.* at 57 (quoting *Illinois v. Gates*, 462 U.S. 213, 243–44 n.13 (1983)).

Although the Fourth Amendment generally requires that officers have probable cause to seize an individual, they do not need probable cause to "briefly detain a citizen" where they "ha[ve] a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Under *Terry*, to "seize[ ] a person on less than probable cause," an officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *United States v. Castle*, 825 F.3d 625, 634 (D.C. Cir. 2016).

Still, such a so-called "*Terry* stop" or "investigatory stop" must be limited, lest it become a *de facto* arrest and require probable cause. For one thing, it must "last no longer than is necessary

to effectuate the purpose of the stop." *Hall v. District of Columbia*, 867 F.3d 138, 153 (D.C. Cir. 2017). An investigatory stop's purpose can include, as its name suggests, "maintain[ing] the status quo momentarily while obtaining more information." *Id.* (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). In addition, such a stop does not typically involve "physical restraint." *Hargraves v. District of Columbia*, 134 F. Supp. 3d 68, 82 (D.D.C. 2015). However, the use of some physical restraint, such as putting the suspect in handcuffs, "does not automatically convert [an investigatory stop] into an arrest," *id.*, because "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it," *Graham v. Connor,* 490 U.S. 386, 396 (1989). And officers may use additional force in effecting the investigatory stop where "the suspect poses an immediate threat to the safety of the officers or others" or "is actively resisting arrest or attempting to evade arrest by flight." *United States v. Dykes*, 406 F.3d 717, 720 (D.C. Cir. 2005) (quoting *Graham*, 490 U.S. at 396). In those circumstances, the officers' use of physical force does not convert the investigatory stop into an arrest for which probable cause must be present.

Those black-letter rules doom Hylton's unreasonable seizure claim. When Delisi first arrived on the scene, he possessed, at minimum, "specific and articulable facts" to "support a reasonable and articulable suspicion that [Hylton was] engaged in criminal activity." *Castle*, 825 F.3d at 634. At that time, and as the Parties do not dispute, he believed that Hylton was spray-painting the side of a building that she did not live in or own, ECF 26-1 ¶ 3; ECF 28-1 ¶ 3, which can constitute a crime under D.C. law, *see*, *e.g.*, D.C. Code § 22-3312.01 ("It shall be unlawful for any person . . . to write, mark, draw, or paint, without the consent of the owner or proprietor thereof . . . any word, sign, or figure upon . . . . [a]ny property . . . ."). Notably, he would have observed that she was spray-painting at night, ECF 26-1 ¶ 1, which may have

contributed to his sense of suspicion. *See United States v. Brown*, 334 F.3d 1161, 1165 (D.C. Cir. 2003) (describing "the lateness of the hour" as a relevant factor in the reasonable suspicion analysis). These factors, taken together, provided Delisi reasonable grounds to suspect "criminal activity may be afoot," approach Hylton, and request that she stop painting the building so he could investigate the scene. *Edmonds*, 240 F.3d at 59.

Hylton argues that, at this early point in the confrontation, Delisi had two valid options: "arrest or validly seize her, or verbally tell her to stop what she was doing without physically touching her." ECF 28 at 13. She claims that Delisi did neither and that he is "legally responsible for the consequences." *Id.* Those claims misstate both the facts and the law. Factually, although the record does not show that Delisi used the specific word, "Stop," it is undisputed that he told Hylton, "you can't spray paint there," and that she understood him to be giving her instructions. ECF 26-1 ¶ 8; *id.* ¶ 7 (Hylton saying to Delisi, "[y]ou're tryna tell me what I cannot do"). Further, legally, Delisi was authorized to use some degree of physical force to investigate the scene under *Terry* and *Graham*. Recall that Delisi physically touched Hylton (on the arm holding the spray can) only after she had defied his verbal instructions and continued to spray-paint the wall. ECF 26-1 ¶ 9. In other words, Delisi first tried to "maintain the status quo" through verbal commands. Only after those commands failed did he use some physical force to keep her from continuing to spray-paint. *See* ECF 28-1 ¶ 101 (Delisi recounting that he "tried to grab [Hylton] real quick" to "get her to stop spray-painting the wall" (quoting Delisi BWC 18:22:40–18:22:54)). All of that conduct falls squarely under *Terry* and its progeny, and Delisi's reasonable suspicion that Hylton was vandalizing someone else's property justifies his conduct.

Arguably, the rest of the 35-second physical struggle between Delisi, Hylton, and the officers who came to Delisi's aid also falls under *Terry*'s shield, given Hylton's physical

resistance. *See Dykes*, 406 F.3d at 384. But the Court need not, and does not, decide that question because Hylton's conduct gave Delisi the right to move beyond an investigatory stop into an arrest. D.C. law criminalizes "assault[ing] a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties." D.C. Code § 22–405(b). And the D.C. Court of Appeals defines "assault" as "an attempt with force or violence to do a corporal injury to another." *Perez Hernandez v. United States*, 286 A.3d 990, 997 (D.C. 2022) (en banc) (quoting *Patterson v. Pillans*, 43 App. D.C. 505, 506 (D.C. Cir. 1915)). Once Hylton turned around and swung her arm at Delisi (while holding a canister of spray paint), he had probable cause to believe she was attempting to use force or violence to injure him. *See* ECF 26 at 19–20. From that moment, Delisi possessed probable cause to seize Hylton, and Hylton's unreasonable seizure claim must fail. *Whren v. United States*, 517 U.S. 806, 817 (1996) (explaining that, with "rare exceptions," the reasonableness of a seizure "is not in doubt where . . . the seizure is based upon probable cause").[12]

---

[12] To be fair to Hylton, Defendants' motion partially misrepresents the law on this issue. At one point, Defendants argue that Delisi "had probable cause to arrest Plaintiff for APO" as soon as she "did not comply with [Delisi's] lawful commands." ECF 26 at 19–20. For support, Defendants quote the 2015 version of D.C. Code § 22–405(b), which criminalized anyone who "without justifiable and excusable cause, assaults, resists, opposes, impedes, intimidates, or interferes with a law enforcement officer on account of, or while that law enforcement officer is engaged in the performance of his or her official duties." *See* ECF 26 at 19 (quoting D.C. Code § 22–405(b) (2015)). But the D.C. Council amended that statute in 2017, three years before the incident at issue here, due to concerns that the prior language was overbroad and criminalized "even yelling at an officer." *Coleman v. United States*, 194 A.3d 915, 917–18 (D.C. 2018). Since then, Section 22-405 criminalizes only "assault[]" of a law enforcement officer, whereas a new provision, Section 22-405.01, criminalizes "resist[ing] an arrest." D.C. Code §§ 22–405(b), 22–405.01(b). In other words, merely resisting or disobeying an officer's instructions before any attempt at an arrest has begun is no longer a crime in D.C. And the cases in this Circuit that rely on that statute as providing probable cause to arrest someone who yells at or disobeys an officer—most notably, *Cromartie v. District of Columbia*, 479 Fed. App'x 355, 357 (D.C. Cir. 2012)—are no longer good law for events that occurred in 2017 or later. It is therefore concerning that Defendants quoted that old, now-defunct version of the law, and cited *Cromartie*, to argue that Delisi had probable cause to arrest Hylton merely because she yelled and disobeyed his orders. Such an argument from the District, misquoting its own laws in briefing to this Court, is frivolous. Ultimately, though, Defendants' error does not affect the outcome here because Delisi developed probable cause soon thereafter, as the Court has explained.

Hylton suggests that Delisi did not possess probable cause when he seized her because Hylton told him she had permission to spray paint the building. ECF 28 at 13–14. But Delisi did not need probable cause to conduct an investigatory stop or to effectuate that stop by grabbing Hylton's arm. Further, even had he needed to meet the higher standard of probable cause, Delisi was not obligated to believe Hylton's claim that she had permission to spray-paint the building. A mistaken determination of suspicious or criminal behavior does not automatically render a seizure unlawful, *see Herring v. United States*, 555 U.S. 135, 139 (2009), and the probable cause analysis "does not depend on the elimination of all innocent explanations for a situation," *United States v. Jackson*, 415 F.3d 88, 94 (D.C. Cir. 2005). Rather, the crux of the inquiry Delisi had to conduct, even under the higher probable-cause bar, was whether Delisi reasonably believed Hylton's conduct was illegal. *See Wesby*, 583 U.S. at 56–57. Hylton's statement that she had permission to spray-paint the wall is one factor that Delisi could have considered in making his determination— but it was also reasonable for him to consider that Hylton was spray-painting the side of a building, at night, that he believed she did not own or live in. Under those circumstances, it was not unreasonable for Delisi to conduct a brief seizure in order to maintain the status quo and investigate the scene.

Hylton also argues that the seizure that followed Hylton's swing was unlawful because Delisi was not "attempt[ing] to effect an arrest." ECF 28 at 12. She cites a single out-of-circuit district court opinion to suggest that the Fourth Amendment bars an officer from "striking an individual who was not being arrested and was not presenting an imminent threat to the safety of the officer." *Id.* (quoting *Williams v. Cnty. of Scotts Bluff*, No. 05-cv-5018, 2006 WL 1288631, at *3 (D. Neb. May 9, 2006)). Even construing the facts in Hylton's favor, that Delisi never intended to arrest Hylton, the Court remains unconvinced. For one thing, *Williams* involved an

excessive force claim, not an unreasonable seizure claim. *See* 2006 WL 1288631, at *3. As discussed below, Hylton does not properly allege an excessive force claim and instead only alleges Fourth Amendment unreasonable seizure. For another, that court cited multiple facts that contributed to its determination that a reasonable jury could find a constitutional violation, not just the fact that the officer never formally arrested the suspect. *See id.*

What's more, even if *Williams* were on point, it would not bind this Court. Neither the Supreme Court, the D.C. Circuit, nor any court in this District (or even the District of Nebraska) of which this Court is aware has held that a seizure that goes beyond a *Terry* stop is reasonable only where an officer intended to or in fact formally arrested (i.e., took into custody and initiated formal charges against) the person they seized. To the contrary, the D.C. Circuit has defined "the term arrest" as "any case where a person is taken into custody *or restrained of his full liberty*." *Coleman v. United States*, 295 F.2d 555, 563–64 (D.C. Cir. 1961) (emphasis added). Similarly, the Supreme Court has held that an arrest "was complete" at the moment when officers "restricted [the suspects'] liberty of movement." *Henry v. United States*, 361 U.S. 98, 103 (1959). Hylton's liberty of movement was restricted when Delisi and his fellow officers restrained her for about 35 seconds until the observing crowd took her away. ECF 26-1 ¶¶ 14–17. Thus, even if Hylton is correct (as the Court must assume she is for purposes of this motion) that Delisi did not *intend* to arrest her, the undisputed facts suggest that Delisi did *in fact* arrest Hylton in the sense relevant for the Fourth Amendment analysis. Hylton's insistence that she was not formally arrested plays word games with the term "arrest" that the caselaw rejects.[13]

---

[13] Hylton's all-or-nothing construction of the term "arrest" also runs headlong into the reasoning of *Terry*. In *Terry*, the Supreme Court explicitly rejected a sharp dichotomy, for Fourth Amendment purposes, between a "technical arrest" (i.e., "a trip to the station house and prosecution for crime") and any police action that falls short of such arrest but nonetheless constitutes a "governmental invasion of a citizen's personal security." 392 U.S. at 16–19. Instead, *Terry* recognized that the Fourth Amendment contemplates (and covers) actions short of formal arrest and held that

Instead, under the Fourth Amendment, this Court need only determine whether the "seizure which took place" was "unreasonable" or not—that is, "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20. Whether the officer later releases the person or takes the person into custody does not impact the analysis of whether the seizure was justified in the moment. Neither does any subjective intent of the officer, because "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004); *see id.* at 153–54 (rejecting a rule that would make "the lawfulness of an arrest turn upon the motivation of the arresting officer"). The question here is not whether Delisi intended to take Hylton into formal custody when he seized her—it is whether he possessed sufficient justification to effect the seizure. In this case, because of Hylton's conduct, he had reasonable suspicion and then probable cause to seize Hylton. And when an officer has probable cause, even amid "protestations of innocence," a seizure is not unreasonable. *Wesby*, 583 U.S. at 62.

In short, when Delisi first approached Hylton upon seeing her standing in a parking lot at night and spray-painting the side of a building she did not own, he had, at minimum, reasonable suspicion to conduct an investigatory stop. No unreasonable seizure. When Hylton continued spray-painting the building in defiance of his instruction that she not do so, he had the authority to escalate his investigatory stop by applying physical force to maintain the status quo. Again, no unreasonable seizure. When she then swung her arm at Delisi, he had probable cause to arrest her. Still no unreasonable seizure. And when the observing crowd then pulled Hylton away from Delisi

---

the permissible degree and kind of restraint depend on the amount of suspicion that the officer reasonably possesses. *Id.* at 19–22.

and the other officers until Hylton left the scene, the incident ended. No further seizure—unreasonable or otherwise. Accordingly, Hylton fails to state a claim for unreasonable seizure under the Fourth Amendment.

### C. Excessive Force

Hylton next claims that Officer Delisi used excessive force in violation of the Fifth Amendment's Due Process Clause. ECF 21 ¶¶ 51–54. Defendants argue that this claim fails as a matter of law because the Due Process Clause "is inapplicable to any claim that a law enforcement officer utilized excessive force during a detention." ECF 26 at 24. The Court agrees with Defendants' position.

As the Supreme Court held in *Graham*, "*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395.[14] Because the alleged excessive force here occurred in the course of a seizure, Hylton should have brought this claim under the Fourth Amendment rather than the Fifth Amendment. Hylton effectively concedes this point in her response to Defendants' motion to dismiss by noting she brought her substantive due process claim "in the alternative in case Defendants argued that Hylton was not seized." ECF 28 at 10–11 n.2. Yet, Hylton clearly brings only her "[u]nreasonable seizure" claim under the Fourth Amendment—and brings her "[e]xcessive [f]orce" claim under only the Fifth Amendment. *See* ECF 21 at 8; *see also* ECF 28 at 10–11 (Hylton discussing the differences between her

---

[14] Substantive due process claims involving physical force by police may be viable where a search or seizure does not occur but police use physical force. *See Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1998).

unreasonable seizure claim and her excessive force claim). The Court must therefore dismiss Hylton's excessive force claim because it invokes the wrong constitutional provision.

### D. First Amendment Retaliation

Hylton also alleges that Delisi retaliated against her in violation of the First Amendment. ECF 21 ¶¶ 60–65. She claims that her criticism of MPD's treatment of her son and her "painting the wall with permission to do so" was protected speech, *id.* ¶¶ 61–62, and that Delisi seized her in retaliation for that speech, *id.* ¶ 63. Defendants argue that Hylton's claim fails because Delisi had probable cause. ECF 26 at 21–22. Despite its disagreement with some of Defendants' reasoning, the Court ultimately sides with Defendants.

To establish retaliatory arrest, a plaintiff must demonstrate "the absence of probable cause for the arrest." *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). As explained above, Hylton's allegations establish that Delisi had probable cause to arrest Hylton as soon as she swung her can-wielding arm at him. "This alone defeats [her] claim" as to all of Delisi's (and the other officers') conduct after the swing. *Johnson v. District of Columbia*, 490 F. Supp. 3d 144, 158–59 (D.D.C. 2020); *see also Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1227 (10th Cir. 2020) ("We have already concluded that Deputy Estep had probable cause to arrest Hinkle. So, under *Nieves*, Hinkle's retaliatory-arrest claim must fail."); *Lund v. City of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020).

That rule holds even if retaliatory intent made up some portion of Delisi's motivation to seize Hylton, as Hylton claims. *See* ECF 28 at 15–16. That is because an officer's "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway," *Hartman v. Moore*, 547 U.S. 250, 260 (2006). When Hylton took a swing at Delisi, he had probable cause to arrest her for APO. Under *Nieves*, that probable cause provided but-for causation for the arrest, and any other suspected retaliatory motivation is irrelevant. *See*

18

*Nieves*, 587 U.S. at 402–04 (holding that the objective presence of probable cause establishes but-for causation for the arrest and that the officers' subjective motivations are irrelevant at that point).[15]

A slightly different question arises with respect to Delisi's conduct prior to Hylton's swing at him. As explained above, construing the record in the light most favorable to Hylton, Delisi did not have probable cause to arrest Hylton until she swung her arm at him. Yet, he had already taken an "adverse action" against her by conducting an investigatory stop, including grabbing her arm and back. *Nieves*, 587 U.S. at 398; *see Waters v. Madson*, 921 F.3d 725, 742 (8th Cir. 2019) (construing a *Terry* stop as an adverse action for retaliation purposes); *Allen v. Cisneros*, 815 F.3d 239, 244–45 (5th Cir. 2016) (per curiam) (same). Theoretically, the same result should follow. Just as Delisi's arrest of Hylton was justified by probable cause, his investigatory stop was justified by reasonable suspicion, as explained above. So, under the logic of *Nieves*, and *Hartman* before it, any retaliatory motive was not the but-for cause of the stop, and Hylton's First Amendment claim must fail.

The wrinkle is that neither the D.C. Circuit nor the Supreme Court has extended the rule of *Nieves* (arrest) and *Hartman* (malicious prosecution) to the context of investigatory stops. But at least three other circuits have applied that rule to investigatory stops, either on the merits of the First Amendment claim or as a matter of qualified immunity. *See Waters*, 921 F.3d at 742; *Allen*, 815 F.3d at 244–45; *George v. Rehiel*, 738 F.3d 562, 585–86 (3d Cir. 2013). This Court does the same. At a minimum, it was not "clearly established" that Delisi could not conduct an investigatory

---

[15] *Nieves* carves out a narrow exception to this rule "for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so." 587 U.S. at 406. That exception does not help Hylton: she provides no authority, and the Court is not aware of any, demonstrating that officers do not arrest suspects (at least briefly) for the crime of assaulting a police officer.

stop of Hylton upon reasonable suspicion that she was committing a crime just because she was also engaged in First Amendment-protected speech. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.").

Hylton's only retort to these arguments echoes her unreasonable-seizure argument: that Delisi did not intend to formally arrest Hylton and that Defendants' caselaw applies only where the officer actually intended an arrest. ECF 28 at 15–16. But, again, she offers no on-point authority, binding or otherwise, for such a claim. The best Hylton can muster is a claim that Defendants' argument constitutes an "erroneous use of 'greater-includes-the-lesser logic'"—of the kind that courts have rejected in other contexts—because it would authorize an officer to conduct a seizure that falls short of an arrest (the lesser power) just because that officer could have actually completed, or tried to complete, the arrest (the greater power). *Id.*

Not so. Even accepting *arguendo* Hylton's claims that (a) greater-includes-the-lesser reasoning would be inappropriate in this context, and (b) Hylton was not in fact arrested when her "liberty of movement" was restricted," *Henry*, 361 U.S. at 103—neither of which is convincing—Defendants' argument stands. The key case, *Nieves*, turned on whether the officers' conduct was justified by probable cause, an "objective standard[] of reasonableness." 587 U.S. at 403. The "presence of probable cause to arrest," not any *intent* to arrest, is what matters under *Nieves*. *Id.* at 405. Indeed, the *Nieves* Court explicitly rejected any inquiry into the officer's "subjective intent" once probable cause is found. *Id.* at 403. Further, the Supreme Court has made clear that "probable cause to arrest" is precisely equivalent to "probable cause to believe [the suspect] committed the crime." *Pringle*, 540 U.S. at 371–72, 374. As explained above, the objective and undisputed facts and circumstances in the record establish that Delisi had probable cause to believe Hylton was

committing a crime once she swung her arm at him. Under *Nieves*, such probable cause defeats a retaliation claim, regardless of what Hylton claims Delisi intended or was "trying" to do when he seized her. ECF 28 at 15. And by that same logic, Delisi's reasonable suspicion that Hylton was painting the wall without permission justified Delisi's investigatory stop, again regardless of his subjective intent.

Finally, Hylton's allegation that she was "engaged in protected speech by criticizing MPD's and Delisi's conduct and by spray-painting the wall" does not alter the above analysis. ECF 28 at 16. *Nieves* and its progeny also involve "protected speech." The question in those cases is whether "probable cause to make an arrest," or reasonable suspicion to make a *Terry* stop, "defeats a claim that the arrest was in retaliation for" that "speech protected by the First Amendment." *Nieves*, 587 U.S. at 397–98. Those cases' answer is "yes." Again, Delisi had probable cause to make an arrest because he had probable cause to believe Hylton was committing a crime. Accordingly, under *Nieves*, Hylton's retaliation claim must be dismissed whether she was engaged in protected speech or not.

### E. False Arrest

Hylton also alleges that Delisi administered a false arrest under D.C. common law. ECF 21 ¶¶ 56–59.[16] This claim suffers from the same defect as Hylton's constitutional claims: Delisi had reasonable suspicion and then probable cause to seize her. Under D.C. law, "[t]he gravamen of a complaint for false arrest . . . is an unlawful detention." *Enders v. District of Columbia*, 4 A.3d

---

[16] Although, by this point, the Court has granted judgment against all of Hylton's federal claims, the Court retains supplemental jurisdiction over Hylton's common-law false arrest and battery claims. Defendants request that the Court exercise such jurisdiction over these claims, Hylton does not object, and the Court agrees that supplemental jurisdiction is appropriate because the claims "derive from a common nucleus of operative fact." *Women Prisoners of the D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 901, 920 (D.C. Cir. 1996); *see* ECF 26 at 28–29; ECF 28 at 16.

457, 461 (D.C. 2010). Without that, the claim fails. *See id.* Accordingly, where the officer has "so-called constitutional probable cause to arrest, determined by reference to the objective standard used to determine probable cause in a criminal proceeding . . . the arrest will be lawful and the officer accordingly will have a complete defense to a false arrest claim." *Scales v. District of Columbia*, 973 A.2d 722, 729 (D.C. 2009). Such a defense is "based entirely on the objective facts" and "does not consider what [the] officer may have actually, even reasonably, perceived the facts to be." *Id.* Similarly, a false arrest claim fails for investigatory stops where the police have the constitutionally required reasonable suspicion. *See, e.g.*, *Zhi Chen v. District of Columbia*, 808 F. Supp. 2d 252, 257 (D.D.C. 2011); *Olaniyi v. District of Columbia*, 876 F. Supp. 2d 39, 53 (D.D.C. 2012). As already established, Delisi had constitutional reasonable suspicion and then probable cause to arrest Hylton. Her false arrest claim therefore "must fail as a matter of law." *Scales*, 973 A.2d at 729.

Hylton's argument to the contrary misstates that clear rule. Hylton points to an earlier D.C. Court of Appeals case for the proposition that an officer has a defense to false arrest "only where the officer can demonstrate that (1) he or she believed, in good faith, that his or her conduct was lawful, and (2) this belief was reasonable." ECF 28 at 17 (quoting *Scott v. District of Columbia*, 493 A.2d 319, 321 (D.C. 1985)). But that is not what *Scott* says. Instead, *Scott* describes the above test as *a* way an officer "can justify his conduct," not the *only* way. *Scott*, 493 A.2d at 321. And, as Defendants correctly note, more recent D.C. caselaw makes clear that *Scott*'s "subjective" test is just one of two alternatives available to the defending officer; the other is the "objective showing" of constitutional probable cause. *Scales*, 973 A.2d at 729; ECF 26 at 29; ECF 29 at 12–13. Defendants have established the latter, which suffices to defeat Hylton's false arrest claim.

### F.  Battery

Finally, Hylton alleges a battery claim under D.C. law. ECF 21 ¶¶ 66–70. Hylton stands firm on her claim that Delisi neither subjectively believed nor reasonably could have believed that Hylton was committing a crime. *Id* ¶¶ 69–70; ECF 28 at 18–19. Defendants argue that Delisi's battery was privileged because his use of force was reasonable under the circumstances, ECF 26 at 29, and the Court agrees.

A battery consists of "an intentional act that causes a harmful or offensive bodily contact." *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007) (quoting *Jackson v. District of Columbia*, 412 A.2d 948, 955 (D.C. 1980)). There is no dispute that Delisi's conduct constituted battery. ECF 28 at 18. The battery occurred when Delisi grabbed Hylton's right arm to take the spray-paint can away from her, placed his left hand on her back, and restrained her for about 30 seconds. *See* ECF 26-1 ¶¶ 11–15.

However, an officer has a "qualified privilege" to commit what would otherwise be battery "to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Scales*, 973 A.2d at 730 (quoting *Evans-Reid*, 930 A.2d at 937). That same rule applies to investigative stops. *Katz v. District of Columbia*, 285 A.3d 1289, 1312 (D.C. 2022). In both contexts, the question is "whether the officer's conduct was reasonably necessary and thereby privileged." *Id.* (quoting *District of Columbia v. Chinn*, 839 A.2d 701, 707 (D.C. 2003)). Unlike the privilege for false arrest, this test of reasonableness "is both subjective and objective: the officer must subjectively believe that he or she used no more force than necessary, but the officer's judgment is compared to that of a hypothetical reasonable police officer placed in the same situation." *Scales*, 973 A.2d at 730. And "[t]he officer's judgment is to be reviewed from the perspective of a reasonable officer on the scene," *id*, not "with the 20-20 vision of hindsight," *Chinn*, 839 A.2d at 706. D.C. law therefore "allow[s] for the fact that police officers

are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (quoting *Graham*, 490 U.S. at 397).

Defendants contend that, from Delisi's perspective on the scene, Delisi used reasonable but necessary force to seize Hylton and prevent her from engaging further in what he reasonably believed to be criminal acts—first, apparent destruction of property, and then assaulting a police officer. ECF 26 at 32. The Court agrees. When Delisi arrived on the scene, he encountered Hylton spray-painting a building at night and subjectively and reasonably believed that she was committing a crime in doing so. ECF 26-1 ¶¶ 1, 3. At that point, he gave her verbal instructions to stop painting the wall (even if he did not use those exact words). *Id.* ¶¶ 7–8. Only after Hylton yelled at Delisi, turned away, "resumed spray-painting," and ignored Delisi's further instruction not to paint the wall did he physically touch her to get her to stop spray-painting. *Id.* ¶¶ 7–11. The caselaw establishes that such a use of force is reasonable. For example, judges in this District (relying on D.C. law) have authorized officers to handcuff suspects when conducting an investigative stop, particularly when the suspect does not follow verbal instructions. *See, e.g.*, *Hargraves*, 134 F. Supp. 3d at 82–83 (citing *Graham*, 490 U.S. at 396); *Moore v. Volpe*, 177 F. Supp. 3d 409, 417–18 (D.D.C. 2016). And the D.C. Court of Appeals has "recognized that handcuffing can sometimes be a reasonable way for officers to 'maintain the status quo' while diligently pursuing an investigation, such as where a suspect may attempt to flee." *Katz*, 285 A.3d at 1306.[17] Indeed, "[c]ourts have routinely held the use of handcuffs in the *Terry* context to be

---

[17] That said, the D.C. Court of Appeals, in that same case, said that "[h]andcuffing is ordinarily improper in a *Terry* stop absent a safety concern." *Katz*, 285 A.3d at 1306. It is not clear from the BWC footage that Hylton posed a safety threat to Delisi before she swung her arm at him. Yet, the *Katz* opinion's explanation of the law on this issue suggests that the resisting-an-officer's-instructions justification for handcuffing during a *Terry* stop, as recognized by *Womack*, constitutes an exception to that rule of what is "ordinarily" improper. *See Katz*, 285 A.3d at 1306 (citing *Womack*, 673

reasonable in situations where suspects attempted to resist police, made furtive gestures, ignored police commands, attempted to flee, or otherwise frustrated police inquiry." *Womack v. United States*, 673 A.3d 603, 609 (D.C. 1996).

Under that caselaw, Delisi's use of force during the investigative-stop portion of this incident was reasonable as a matter of law. Although Delisi would have been authorized to handcuff Hylton once she "ignored [Delisi's] commands" and "frustrated [his] inquiry" into the scene, *id.*, Delisi did not even get that far. Instead, he merely grabbed her arm, at which point she resisted and swung her other arm at him. Such minimal use of force on Delisi's part does not create a jury issue on Hylton's battery claim.

Neither does Delisi's subsequent restraint of Hylton after she swung her arm at him. That swing not only gave Delisi probable cause to arrest Hylton for APO; it also authorized reasonable force to restrain her. By swinging her arm at Delisi, Hylton began to "pose[] an immediate threat to the safety of the officers or others" and was "actively resisting arrest." *Graham*, 490 U.S. at 396. As the D.C. Court of Appeals has held, "[a]ny person, including an officer, is justified in using reasonable force to repel an actual assault, or if he reasonably believes he is in danger of bodily harm." *Evans-Reid*, 930 A.2d at 937 (quoting *Etheredge*, 635 A.2d at 916). Indeed, courts applying these rules have upheld similar, if not more severe, police uses of force in response to less. *See, e.g.*, *Oberwetter v. Hilliard*, 639 F.3d 545, 548, 555 (D.C. Cir. 2011) (holding, in the related constitutional excessive force context, that an officer did not use excessive force by "ripping apart [the plaintiff's] earbud, shoving her against a pillar, and violently twisting her arm" when she refused the officer's order to stop dancing and leave the Jefferson Memorial at night). Moreover,

---

A.2d at 609). Further, even if that is incorrect and *Katz* narrowed *Womack sub silentio*, that would not change the result here because Delisi's use of force during the *Terry*-stop portion of this encounter (i.e., before she swung her arm at him) fell short of handcuffing.

Hylton acknowledges that she was not "gravely injured" and that Delisi "did not draw a weapon on her or attempt to tackle or beat her." ECF 28 at 19. As Hylton herself puts it, the alleged battery was "subtle." *Id.* This fact further weakens her battery claim. *Cf. Wasserman v. Rodacker*, 557 F.3d 635, 641 (D.C. Cir. 2009) (holding that the suspect's lack of "bruise or injury . . . tends to confirm that [the officer] did not use more force than reasonably appeared necessary to secure [the suspect's] compliance"). Finally, after some other men pulled Hylton away from Delisi's hold, she stopped spray-painting, stopped swinging at Delisi, and left. And Delisi made no further physical contact.

Like clockwork, Hylton argues again that Delisi's force was excessive and therefore not privileged—under both her (defective) Fifth Amendment claim and her D.C. common-law battery claim—because Delisi "did not make any . . . attempt to effect an arrest." ECF 28 at 12. The Court has already explained why that argument holds no water in the constitutional context, but it also does nothing for Hylton under D.C. common law. For one thing, her common-law false arrest claim relies on the premise that Hylton was, well, arrested. *See* ECF 28 at 17 ("To plead false arrest under D.C. law, plaintiffs must allege that defendants wrongfully arrested them."). To try to have it both ways by alleging arrest for common-law false arrest but no arrest for common-law battery is a bridge too far.[18] In addition, Hylton correctly concedes in her excessive-force argument that Delisi would have been justified in using the force he used against her once he developed "probable cause to arrest" her. *Id.* at 13. Hylton merely argues that no such probable cause developed until after Delisi physically touched her. *Id.* That is true, but irrelevant. Delisi's initial contact with Hylton was privileged as part of his *Terry* stop. And once she swung at him, he had probable cause

---

[18] Of course, it is possible that Hylton intended to plead those claims as alternatives, but she does not say so in her briefing, nor does she otherwise acknowledge this contradiction.

to arrest her for APO. Hylton provides no authority that condemns the 35-second physical restraint of someone who apparently assaults an officer, nor could she. Her battery claim cannot overcome that problem.[19]

## IV.  CONCLUSION

All that said, construing all the facts in Hylton's favor, the Court understands why Hylton was upset by her interaction with Delisi. Hylton claims that she was spray-painting, with permission, in honor of her son who was killed by an MPD officer. Further, she believes that Delisi tried to stop her from doing so, and physically seized her, in retaliation for her protests of her son's murder. That experience could make any mother—any person—feel deeply wronged. But this Court must apply the law. And the law allows officers to investigate potential crimes and use reasonable force to seize apparent wrongdoers who resist those officers' instructions and attempt to physically assault the officers—even when done against the backdrop of tragic loss.

For the foregoing reasons, Defendants' motion for summary judgment, ECF 26, is **GRANTED**.

A separate Order accompanies this memorandum opinion.

**SO ORDERED.**

_____
Jia M. Cobb
U.S. District Court Judge

Date: March 7, 2025

_____

[19] Had Hylton properly alleged a constitutional excessive force claim under the Fourth Amendment, that claim would have failed for the same reasons as her battery claim. *See Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998) (citing *Etheredge*, 635 A.2d at 916, for the proposition that constitutional excessive force and D.C. common-law battery claims apply a "similar" standard, namely the Supreme Court's standard in *Graham*).